Good morning, Your Honors, and may it please the Court, I'm Paul Hoffman, representing the Child Slave Labor plaintiffs. I'd like to reserve five minutes of my time if possible, consistent with your questions for rebuttal. I'd like to address three issues. The first would be why the Supreme Court's decision in Kiobel does not bar this case. And second, I'd like to address corporate liability briefly, and then aiding and abetting under the Alien Tort Statute. First, with respect to Kiobel, starting, the opposing counsel interprets Kiobel, I think, as they would like it to be, as opposed to what it actually is when you read it. The Kiobel decision was a narrow decision in the sense that Justice Kennedy, the crucial fifth vote, and Justices Alito and Thomas say that it's a narrow decision. And the way that the defendants read it, it would write out virtually every ATS case that's been brought in the last 33 years. So that's clearly not anybody's definition of narrow or bright-line rule. And if one looks at Section 4 of the opinion, which I think is the crucial section, the standard for whether a case gets around the principles underlying the presumption against extraterritoriality, because the Court is clear in the majority opinion that it's not actually the presumption, because this is a jurisdictional statute. It talks about the principles underlying the presumption. Ginsburg. Let me ask you, your complaint was filed prior to Kiobel. That's correct. And you argue in the complaint that the complaint alleges a significant amount of misconduct in the United States. But it appears to me the complaint does not specify where the defendants alleged misconduct took place, where in the complaint do you allege that the acts of aiding and abetting took place in the United States? Well, as the Court has acknowledged, prior to Kiobel, there was no court that had found that the ATS was not extraterritorial. And so we did not allege any of those things. So would you want to amend your complaint to someone? We would like to, I mean, we would certainly like to amend our complaint to lay out what we believe is the U.S. connection. But in fact, there are some things in the complaint that are either explicit or implicit in the allegations to date that show U.S. conduct. And that U.S. conduct, for example, is the fact, number one, that these are U.S. corporations taking decisions that have an impact in the Ivory Coast, including contractual relationships, including exclusive buyer-supplier relationships, monitoring all sorts of activities that would ordinarily be undertaken at least in part or directed from the United States. I think it would be reasonable for us to allege that if we were required to allege that for extraterritoriality. In addition to that, these defendants are alleged to have lobbied to protect their supply of cocoa that's based on a system of child slave labor, that they lobbied Congress in the United States to prevent labeling requirements under the Engle Act that would have put the child labor system out of business under the allegations in our complaint, because the majority of the cocoa from the Ivory Coast comes to the United States and the majority of that is controlled by these defendants. And so that is activity within the United States that furthers the continuance of a child labor system that took place in this country, affecting, you know, activities with the U.S. Congress, involving important U.S. policies that are in fact reflected in U.S. law. One other point about Kiobel that I think is important is that the Kiobel case did not deal with a U.S. defendant, a U.S. corporate defendant. And I think that's really crucial in the sense that most of the briefing in Kiobel and the argument in Kiobel and the focus of Kiobel, and I was the one that argued it, so I was in the middle of that, was about the fact that that was a foreign cube case. It was a case involving foreign corporations, foreign plaintiffs, every one of the acts took place in another country, and the only connection to the United States was the mere corporate presence, as Chief Justice Roberts called it in the opinion, of these apparent corporations. That's completely different here. And I think that Kiobel was trying to separate these U.S. entities from the analysis in the way that he distinguishes the Bradford opinion, because the Bradford opinion, the 1795 Attorney General opinion, had to do with an attack on the territory of Sierra Leone, and it was an attack that U.S. citizens joined in. And when considering the implications of Bradford for its analysis, Chief Justice Roberts says, well, that involved U.S. citizens and possibly a violation of a treaty. And I think what that shows is that the court was not deciding the question of U.S. defendants. And in fact, that mirrors what Judge Kleinfeld said in his dissent on extraterritoriality in the Sarai opinion. Judge Kleinfeld drew a distinction between U.S. defendants and non-U.S. defendants, the foreign states. And that's what the United States would have been concerned about, acts by U.S. citizens, whether they took place on U.S. territory or not, that might have brought the country into war or conflict with other countries. And so with respect to U.S. defendants, the Alien Tort Statute clearly would have been concerned with the way U.S. defendants committed international human rights violations or international law violations in those days for which the United States might have been found either legally or morally responsible. Okay, let's move off of COBOL and go to the next issue. Actually, I'll tell you, since you want to reserve five minutes, I'll tell you my biggest concern is the issue, the question of aiding and abetting liability and what, you know, the law, which law governs it, whether it's customary international law, and if so, what is that law? Okay, Your Honor, the, there's obviously a, well, there's not much of a split anymore in terms of the terms of where it comes from. I mean, the en banc decision in Sarai, although I understand it's vacated, came to the conclusion that it was international law. Other circuits have done that. The Eleventh Circuit, we believe, still does adhere to federal common law. But assuming it's international law, the international law standard is practical assistance, encouragement or moral support that has a substantial effect on the commission of the crime, and the mens rea is knowledge. And I think that the talent of the commission is a great asset to the commission. So where do you get that standard from? Well, the standard, I think, comes from, number one, it comes from Nuremberg, as laid out by the Amicus Curia and Nuremberg scholars, and the review of those cases. It comes from the ICTY and ICTR in terms of review of those cases, from Fror and Deese up. In terms of knowledge, I want to, there's an Actus Reis question that has come up under Rome's statute. No. In fact, our position is that the Rome statute should not be relied on and that it was a mistake for the Second Circuit and Fourth Circuit and Aziz and Talisman to rely on it. And the Taylor decision, which we've put before the court from the special court for Sierra Leone, indicates that if you're doing a customary international law analysis, the Rome statute's irrelevant. It's not based on customary international law. Taylor says that explicitly and rejects looking at it. If you look at Ambassador Schaeffer's Amicus brief, he lays out why that Article 25 and 30 were not intended to be customary international law. They were crafted for the purpose of this treaty. In terms of the whole body of international law, it is knowledge. And in fact, I think Judge Pregerson, in his opinion, and Sarai, talks about why even the Rome statute should be viewed as having a knowledge scienter. And so we think it's fairly clear from all these authorities that have been briefed thoroughly by the parties that knowledge is the mens rea. And that in this particular case, what you have are allegations that these defendants engaged in exclusive buyer-supplier relationships and additional financial assistance of various kinds and technical assistance, and that without that assistance, the system of child slave labor, including the one that captured our plaintiffs in this case, could not exist, that it is a but-for cause. That's in paragraph 56 of our complaint. Counsel, may I ask you if there are any cases, to your knowledge, that incorporate the knowledge requirement as opposed to the specific intent requirement? Yes. I mean, I think we've cited virtually all the Nuremberg cases do. We've cited all of them. What about circuit cases in this country? Well, I mean, Doe v. Uniquel, though vacated, adopted knowledge, and Sarai, of course, didn't decide one way or the other. Are there any extant cases that you are aware of? Well, all the 11th Circuit cases use knowledge. All the 11th Circuit cases use restatement section 876B, which has a knowledge requirement. Doe v. Exxon, unfortunately, also vacated, although for other reasons. Probably for a reason. But not for this reason. I mean, it was for a different reason. What about the 2nd Circuit and the 4th Circuit cases? How do you distinguish those cases, or do you distinguish those? Well, I think there are two things. One is that, with respect to, and Talisman is the key case, I guess, because I think Aziz basically followed Talisman. In Talisman, I think it's just wrongly decided. They looked to the Rome Statute, which wasn't customary international law, and somehow found that because that had a higher standard, they ought to accept that. And I think the Alien Tort Statute, as interpreted by Sosa and a body of jurisprudence, says you apply customary international law where there is customary international law. And so I think they had that wrong. With respect to the particular application of Talisman, I think there's an additional problem. And this is an issue that I think comes up with a lot of the other discussion in the briefs. All of the criminal cases at the international level on Talisman itself were based on a full factual record. Talisman was a summary judgment record. I was just going to make that point. That's part of what I don't understand about the posture of this case, because the complaint was dismissed, yet a number of the cases that I've read, including Talisman, which I think is discussed at length by both parties, are at the summary judgment stage. So they've had an opportunity to have discovery, to find out what really was going on, what level of knowledge or purpose or effect or whatever standard was or was not occurring. And I think what happened, the district court somehow tried to apply standards and analyses that were based on full factual records, either in trials, without giving us the opportunity to get the discovery that would show the actual mens rea, the actual acts of substantial assistance. And I think on the allegations themselves, they clearly show the complete co-participation, really, of these defendants in a system of child slave labor. So whatever the standards are, they're covered by this, and there's loads of allegations that make those allegations plausible in terms of the existence of widespread child slave labor. Not that we say so, but that the United States says so, the ILO says so, the United Nations says so. But I thought you acknowledged that you could not meet the specific intent requirement. We, if the specific intent requirement that Judge Wilson came up with, we acknowledged we could not meet it. We did not have the ability to make allegations that these defendants subjectively intended to create the child slave labor that captured our clients. We can't say that. What we can say is that they had knowledge of it, they willingly got into it, they perpetuated it, and their actions substantially assisted a pattern of criminal activity that is clearly violative of international law. You think you could establish that they intended to profit from it? Yes. I mean, the whole system was intended. Didn't it lower the cost of producing the cocoa? Right, of course. And they were able to get lower-priced cocoa on an exclusive basis because it's based on the facts of child slave labor, and they had, they were able to do that and bring it into this country. But is that enough under the specific intent requirement? Well, if the specific intent requirement is that they shared the mens rea of the actual slaveholders, then I think we have a problem. If we have to show that they purchased the locks or the chains or the whips, we can't show that they did that. But we don't have to show that under all of these cases under Flick and Crouch, and the Nuremberg cases don't show you have to do that. In fact, one of them shows that if you ask for a higher production quota, even though you don't even like slave labor, you don't want it, you hate it, you hate the regime, but you've asked for more production, and you know that it's coming from slave labor, you can be convicted. And so, you know, certainly at the pleading stage, we believe we had plausible allegations that these defendants aided and abetted a system of child slave labor that injured our clients, and that we should at least get to the next stage. Based on that, and I realize I now have 12 seconds, so. We'll see how your opposing counsel does. Good morning, Your Honor, and may it please the Court, Andrew Pincus for Appalese, Archers, Daniels, Midland, Cargill, and Nestle USA. I'd like to start, if I may, with the aiding and abetting question that Your Honor asked about. First, just on the record question, a large number of these cases have been decided at the motion to dismiss stage. Aziz, the Fourth Circuit case was decided there. It's a little bit troubling to me about that. I do think Judge Wilson sort of came up with his own standards. When the law is, you know, developing, it's not really all that clear, and in the absence of a record, it's hard to really question and apply a standard. Well, Your Honor, this case was litigated over many years and many sets of pleadings in the district court, and the district court gave plaintiffs one opportunity that plaintiffs took to file an amended complaint, and then at the end of his ultimate decision, he said, here's my standard. If you think you have more facts, please do file an amended complaint. Don't just do it for the sake of doing it, but if you think you can meet this standard or there are additional facts that might change my mind, please do. So there was a lot of discussion over a period of many years and many sets of pleadings to address these questions, and the allegations, frankly, have not changed at all. The allegations of aiding and abetting fall into two basic buckets. One is purchasing the COCO and the financial and other relationships attendant to that, the providing of fertilizer and labor advice and exclusive contracts. And then the allegation that the defendants had the power to change the labor practices and didn't exercise it. Those are really the bottom line of what the allegations have been, and they really haven't changed. And I think the critical thing here is not only have plaintiffs had several chances to elaborate on them if they wish, but it's very clear from the cases that however these legal standard issues are, they have not changed. And I think that's a very important point. And if I can start just with the Actus Reis parts of the allegation. Commercial transactions, buying and selling a good is not sufficient to constitute, to satisfy the Actus Reis standard unless the good's nature ties it to the principal's, the principal wrongdoer's illegal activity. That's shown in the Nuremberg bank loan cases. That's why the bank loans, the banker who lent money to SS businesses that used slave labor was acquitted because he was engaged in a commercial relationship and that wasn't enough. They supplied machinery, they supplied training, they were actively involved in the production of the cocoa with child slave labor. Well, the training they supplied was not to use slave labor. I mean, one of the ironies of this case is these companies, in addition to providing instruction about fertilizer and other farming techniques, provide instruction about good labor techniques. And the allegation is that doing that somehow makes them an aid or a better of child slavery. But I think the critical fact is all of those things are normal incidents of commercial relationships between the purchasers of farming goods and farming. They're the same kinds of relationships that these companies have with farmers in the United States and plaintiffs haven't argued to the contrary. Exclusive dealing relations. So did you have people from these corporations on the ground in the farms in the Ivory Coast working with the farmers? There are representatives of the companies on the ground. And one of the things that's interesting about these complaints as well on the knowledge side is there is no allegation that these companies purchased cocoa from a farm on which they knew it was occurring. Not one. The allegation is they generally knew child slavery was going on in the vicinity. But there's no allegation of a purchase from a farm on which there was child slavery occurring. There's one allegation that one company had knowledge of a farm, but there's no allegation of purchases from that farm and also no allegation that these plaintiffs worked on that farm. So part of the problem here is very, very general. That's why even under a knowledge standard we obviously believe that the intent, the mens rea standard should be purpose as the two courts of appeals, the Second and the Fourth Circuit have held. But even under a knowledge standard, there's no knowledge that the conduct here assisted wrongdoing because there's no knowledge of wrongdoing on the farms from which the plaintiffs, the defendants purchased the cocoa. And we think that's a critical omission that makes it, frankly, unnecessary for the court to address this knowledge purpose question, although we believe that the two courts have decided it correctly, because even under a knowledge standard, they can't win. So turning back to the Actus Reis part of the equation, the apartheid court, the district court in the South Africa apartheid case drew the same distinction on Actus Reis. What she said was the commercial subpoena for the commercial transactions that involved the supplying of ordinary cars and ordinary computer equipment doesn't satisfy that Actus Reis requirement. There's not enough of a causal link between those products and the activities, the wrongful activities of the apartheid regime. On the other hand, military equipment specifically designed for military purposes and computers specifically designed for the Actus Reis requirement. So we think the line that's being drawn there is quite clear and makes sense in the context of aiding and abetting, which, after all, involves conduct that is not in itself wrongful. So there has to be something that distinguishes that conduct from, as in the bank loan situation, which was also involved in the apartheid case, the judge there said the fact that banks interacted with the apartheid regime and supplied funds, the same argument could be made in that case that Mr. Hoffman is making here. If those banks hadn't been supplying funds to the apartheid regime, surely that regime would have had more trouble staying in place, and eventually, as we know, the political solution of boycotting did eventually change apartheid. But what the court said is on the alien tort statute in terms of what constitutes Actus Reis for aiding and abetting, that kind of commercial interaction is not enough. Well, help me here. They not only supplied money, they supplied machinery. They were on the ground, obviously observing child slave labor. Why doesn't this amount to knowledge? Well, I was just talking about aiding and abetting. I'm happy to switch. I mean, Actus Reis. I'm happy to switch and talk about knowledge, which obviously is a different test. I think there's no allegation in the complaint that these companies did those things on a farm from which they purchased cocoa and that employed child slaves. That is a critical omission. If the complaint had said John Doe No. 1, one of the plaintiffs worked on Farm X, Farm X at that time was a supplier to one of the defendants, then maybe the inference could be drawn under a knowledge standard, which we don't think is accurate, but maybe under a knowledge standard the inference could be drawn that the assistance to that particular farm that Your Honor is talking about did give rise, did satisfy the knowledge standard, because the assistance was given, knowledge that child slavery was happening on that farm, and so the pieces would be tied together. But the fundamental failure here is there isn't an allegation that any of these three plaintiffs worked on a farm at which, from which the defendants purchased cocoa with the knowledge that the slavery was going on, and we think that's certainly, even under a knowledge standard, that has to be the irreducible minimum. Simply knowing that in this marketplace child slavery occurs can't be enough to state a claim, because then any company that tries to do the right thing, and maybe Mr. Hoffman and I would debate about whether these companies did, but any company that tried to do the right thing couldn't protect itself from a lawsuit being sustained in discovery, just because it did business in a market where generally bad things were occurring, even if it was trying to stop them. But this is on a motion to dismiss. This is also disturbing. Was there an attempt at discovery? I can't, frankly, I can't remember, Your Honor. I'm sure Mr. Hoffman will remember. Certainly the defendants would have resisted discovery. I mean, one of the big picture problems with these lawsuits is this is discovery in Cote d'Ivoire. For most of the period that this lawsuit was going on, there was a revolution underway. There was a civil war in Cote d'Ivoire. So the practicality of discovery is a significant problem in ATS cases generally, which is why we think supervising at the most to dismiss stage is extremely important, and why I think other courts have been receptive and have made decisions at the motion to dismiss stage. If Mr. Hoffman or his colleagues had a person who worked on a farm that satisfied those requirements, then perhaps they could meet the knowledge standard, and we'd be here fighting about knowledge versus purpose more intensively. But they haven't been able to do that, and that seems to be the irreducible minimum for triggering what will be a very, very, very difficult discovery process. One last question. Is there we have the Seventh and Fourth Circuit. Is there a United States Supreme Court decision directly in point? On the aiding and abetting issue. Aiding and abetting or purpose knowledge. Well, I think we would say there are Supreme Court decisions certainly that point the way, but the Supreme Court hasn't addressed what the correct, whether aiding and abetting even exists under the ATS, let alone what the mens rea and actus rea standards would be. So I don't think we can say there is there even a case like Kiabel, which, again, we can argue about the extent to which it controls the extraterritorial issues, but at least the Court has spoken to that question. Every circuit court to address the issue has said that there can be aiding and abetting liability. The only issue is what is the standard. Your Honor, every court that has addressed it has said there is. Every court of appeals opinion that has addressed the mens rea issue has said that the mens rea is purpose. The purpose of what? What is the purpose element directed to? I think that the assistance, the substantial assistance was provided with the purpose of furthering the principal wrongdoer's goal. So you're saying that they have to show that the purpose of your providing, your company's providing assistance to the farms was to further child slavery. Yes. And what if we were to draw an inference that, you know, that they could show that the child slave labor, child slavery actually was purposefully assisted because it kept cocoa prices down? I don't think that you could draw, I think you couldn't draw that inference from this kind of assistance, because I don't think this assistance is targeted on preserving child slavery. The Second Circuit's analysis in the Talisman case is very instructive on this regard. The Second Circuit adopted the purpose standard, and then it went through all of the evidence in that particular case about conduct, and asked exactly the question Your Honor is asking, can we infer from this conduct the purpose that is required to satisfy our legal standard? And they took through, that was a case somewhat like Sarai that involved a company, a minerals company, and assistance, alleged assistance to military and paramilitary forces who did bad things to the people who lived around the country. And the court went through each of four or five categories of assistance and explained why this kind of generic commercial behavior couldn't give rise to an inference of purpose. Right, but that was on summary judgment after full discovery, and so they had something to work with. But the district court in the Apartheid case and the Fourth Circuit and Aziz did exactly the same kind of analysis at the motion to establish the purpose standard. I mean, our position and what the courts and the international tribunals have said about the actus reus requirement is there has to be some causal link. It can't just be the provision of money. It has to have some special connection to the wrongdoing. Right, it has to go beyond. And some of that's been alleged, but we also don't know what could be proved. Well, I think what's been alleged has been precisely what has been found inadequate in every prior case in which it's been considered. One is the commercial transaction, and the other is the things that are incident to commercial transactions, and every court, the Apartheid court, the Nuremberg tribunal has said those kinds of things are absolutely not sufficient to satisfy the actus reus requirement, and there's no pleading to be done to sort of tease that out. What has been found to be sufficient has been, for example, a charitable contribution, not part of a commercial transaction, excuse me, to the leader of the SS, not a commercial transaction. If you give money to the leader of an organization that you know is engaged in horrible criminal activity to use for whatever purpose he requires, that actus reus is certainly enough. And so I think it's quite clear that the conduct is miles away from anything that's been sufficient, and I think that's especially important given the enterprise that courts under the ATS are engaged in, which is there has to be a violation of a definite norm. And, you know, as we say in our brief, that's quite similar to the clearly established law standard that the courts apply in 1983. Child slave labor is a violation of a definite norm? I think it is, Your Honor. And isn't it also a violation of the Convention Against Torture Act? I don't know whether it's a violation of that, but just as every... Well, I think there are a number of treaties that we've signed that are against degrading or inhumane conduct. But the question here is a new form of liability, aiding and abetting. And the question is what is the definite and certain context standard under international law for aiding and abetting liability, just as in 1983, although we know that the Fourth Amendment's prohibition against unreasonable searches and seizures is well recognized, that doesn't mean that there's never qualified immunity in a 1983 case involving a violation of the Fourth Amendment, because those standards have to be broken down in a way that people can understand them. And similarly here, what the Supreme Court has said is you've got to have something that's so accepted in international law that it's the same as piracy and safe passage and the protection of ambassadors was in 1789. And here not only are the legal standards for aiding and abetting that we're talking about not the knowledge standard not accepted for the reasons we talk about in our papers, but what is clearly accepted is that the extent decisions put off limits to actus rea, the very kinds of facts, allegations that these plaintiffs are making. So not only is this a situation, this isn't close to a situation where there's a definite norm saying that this kind of conduct can suffice, all of the cases draw exactly the line we're drawing, which is to say incidents of legitimate commercial transactions in goods that are not peculiarly tied to illegal activity are not grounds for actus rea, period. There aren't any decisions going the other way. And the second part of their argument, that you were in a position to do something and you failed to do it, again, outside of the military command situation, there is not a single decision or civilian government command situation, there's not a single decision imposing that kind of norm. So when you say that the standard, the mens rea standard is purposeful, are you relying on the Rome statute for that? We're relying on the Rome statute and also some of the international law, some of the Nuremberg cases, although I admit that there's a divergence, again, going back to the clearly established law analogy where there's a divergence, the narrower standard is the one that is universally, that is broadly accepted. But how do you respond to your opposing counsel's argument that the Rome statute isn't, in the expert brief we have on that, that the Rome statute doesn't represent international customary law? Well, two responses. First of all, it doesn't represent customary international law. Article 10 says specifically that the part to which it refers is not meant to affect the development of customary international law. But the provision that we're talking about, Article 25, is not in that part. It's in another part of the statute. So we think that's pretty clear evidence that the drafters, if they had meant for the whole thing not to affect customary international law, that Article 10 language would have applied to the whole statute, and it doesn't. Second of all, I think the brief filed by Ambassador Scheffer is sort of akin to a brief filed by a member of Congress about the meaning of the statute. I mean, he certainly was involved in the negotiations, but I think the legal enterprise is to look at the face of the statute and the legally cognizable materials and decide what it means. And the face of the statute pretty clearly says purpose. In Article 25C3. We also submitted recently, or we responded to a submission of a Rwanda international tribunal appellate decision in the Charles Taylor case that plaintiffs had submitted by noting that the interesting discussion of mentray in that case says in the international context, purpose and knowledge may not have the kinds of meaning that we attribute it to in the United States, talking about the model penal code, and saying that knowledge there requires intent. It doesn't require desire, but it requires intent. So even knowledge may be much closer to our interpretation of purpose than plaintiffs and their amici are indicating. All right. I know I'm way over my time. Thank you. Thank you, counsel. And we'll give you a couple of minutes to respond. They went over. So did they have any time left? He was over. He was over. Okay. Three minutes in. Well, let me just make a few quick points. One is that obviously we believe our complaint does satisfy all the requirements in terms of setting forth the standards and that we should be entitled this discovery to have a record. I won't belabor that. But that's not what you said in your blue brief. In your opening brief, you acknowledged that you couldn't meet the specific intent requirement with no qualification. Well, no, but what I'm saying, our position is that the international standard is knowledge and that it's substantial. For all the reasons we briefed throughout, we think that what he has just told you about the Rome Statue and all is just wrong. And we can satisfy what the international standards are. The international standard is not specific intent as Judge Wilson did it. That's what we acknowledged we couldn't do. Everything else we can do and we think we're entitled to get past this roadblock. There was no discovery. No discovery was allowed. So we've been stuck at this stage now for quite a long time. Can you meet the specific intent requirement as articulated in the second and fourth circuits? Well, the thing about Talisman is a little bit confusing in that I was actually the counsel at an appeal in Talisman, so I know a little bit about the record there. The second circuit was the district court was concerned that the evidence in that case, as produced by the plaintiffs in the summary judgment record, did not connect the actual parent company, Talisman Energy, Inc., with what happened. That a lot of the evidence was about the role of subsidiaries and the like. And so when you look at that summary judgment record, the court found that there was a failure of proof with respect to showing purpose of Talisman Energy, Inc., based on the provision of heliports and landing facilities for the bombing runs in South Sudan and the like. And so without a record, I think we will be able to show it, because our argument is that their suspicions were wrong. I think it's enough under anything. To show that but for their assistance there would not be child slave labor, you think that's the standard? No, in fact, we don't even have to reach that. The cases are absolutely clear that we don't have to show but for possession. In fact, the Taylor case is very significant in that it actually says I think the reverse of it. What do you have to show? In your view, what do you have to show in order to meet the specific intent requirement? First of all, we don't think that there is a specific intent requirement. Okay. If we decide that there is a specific intent requirement, in view of your concession in your brief that you cannot meet that, how would you meet that? If the purpose requirement, which we don't think is a specific intent requirement, even if you decided it's purpose, what we think we would need to do to show that is to show that these, and we allege enough for this, I think, that these defendants knew that their assistance and the like was going to sustain this child slave labor system and that they continued to do it knowing that that's what was going to happen. I think when counsel is saying knowing and purpose are similar, what he's saying is that in the Taylor case they're saying if you know that what you're doing is leading to certain kinds of things, well, then your purpose is obviously to have those things continue to happen, like have a child slave labor system that gives you a cheap supply of cocoa coming into this country for all the purposes that you do to make profit. What's your response to opposing counsel's observation that there was never any allegation that cocoa was actually purchased from a farm that used child labor? I think our allegations in a number of places in the complaint say the opposite of that. They say that there were. So the defendants in this case, why these three? Are they the major producers? These are the defendants that control that market as a matter, and there are allegations. 70% of the world's cocoa market comes from Ivory Coast. These are the companies that control that market. The majority of that comes into the United States. And so in terms of the Iqbal plausibility standard, there's a whole structure of this within which our allegations take place involving a widespread, widespread child slave labor, widespread knowledge of child slave labor. A control of the market. What is your evidence there? What would you show that they controlled that market? Well, I think that is a matter of public record in terms of the amounts they take from that and the like. What we would need discovery to do is to find out exactly what they do in particular plantations and the like. A lot of stuff is in public documents, and we've alleged things from their public documents. There have been investigative reporters, Ms. Off, the book that was written about this, lays out a lot of this material, public NGO reports, UN reports, ILO reports. I mean, there's a lot of information about how this works and how our allegations fit into this and how our plaintiffs and putative plaintiff class fit into this. All right. Does anyone have any further questions? All right. Thank you, counsel. John Doe v. Nestle will be submitted. Cuete Hernandez v. Holder has been removed from the calendar, and Alvarado Granados v. Holder is submitted on the briefs, and this session of the court will adjourn for today.
judges: Nelson, Wardlaw, Rawlinson